JEFFERSONIAN PUB. CO. v. WEST, Postmaster.

(District Court, S. D. Georgia. August 29, 1917.)

POST OFFICE ☞14—NONMAILABLE NEWSPAPERS—VIOLATION OF ESPIONAGE ACT.

In a suit to enjoin a postmaster from withdrawing mailing privileges, articles in a newspaper *held* to violate Espionage Act June 15, 1917, tit. 1, § 3, making it an offense for one, when the United States is at war, to willfully make false statements with intent to interfere with the operation or success of its military or naval forces, or to willfully attempt to cause insubordination, disloyalty, mutiny, or refusal of duty in its military or naval forces, or to willfully obstruct its recruiting or enlistment service, and so, under title 12, § 1, to render the paper unmailable.

In Equity. Bill by the Jeffersonian Publishing Company against J. Q. West, Postmaster. Preliminary injunction denied.

S. G. McClendon, of Atlanta, Ga., J. Gordon Jones, of Cordele, Ga., Samuel L. Olive, of Augusta, Ga., and B. J. Stevens, of Thomson, Ga., for plaintiff.

W. H. Lamar, Sol. for Post Office Department, and Earl B. Barnes, Sp. Asst. Atty. Gen., for defendant.

SPEER, District Judge. The bill before the court was brought originally to enjoin the postmaster at Thomson, Ga., from withdrawing the second-class mailing privileges of the Jeffersonian. The action complained of had been taken by the postmaster in obedience to an order of Hon. A. S. Burleson, as Postmaster General.

Appreciating the weighty effect of determination by the Postmaster General of any material and relevant questions of fact arising in the administration of the statutes of Congress relating to his department, a preliminary injunction was withheld. A rule was, however, granted, calling upon the respondent to show cause why the injunction sought should not be granted. At the hearing, it became apparent that the Postmaster General had forbidden the Jeffersonian of the 16th inst. all admittance to the mails; this, upon the ground that it was distinctly unmailable. By suitable amendment, the legality of this conclusion was challenged. The court, being of opinion that the plaintiff was entitled to specific information, not only of those features of the Jeffersonian issued on the 16th inst. held unmailable, but also those in past issues deemed so unmailable as to induce the conclusion by the Attorney General that the publication was not a newspaper, in the meaning of the law conferring the second-class privilege, directed that the respondent should file specifications of all such matter. This has been accordingly done, and thus the question is presented: Do the facts and the determination of the Postmaster General demand or justify a court of the United States in the interference here sought with an administrative branch of government?

In the affidavit of the Postmaster General, after the specification required by the court of the passages in the Jeffersonian held by him to be unmailable, there appears the following statement:

"Deponent further says that in his judgment, in their entirety, the issues (of the Jeffersonian) evince a purpose and intent on the part of the publisher to willfully make or convey false reports or false statements, with intent to interfere with the operation and success of the military or naval forces of the United States, to willfully obstruct the recruiting or enlistment service of the United States to the injury of the service, * * * and that the circulation of such matter is causing antagonism and resistance among the people to the conduct of the war with respect to enlistments, execution of the draft, and the sale of bonds to raise revenue to carry on the war."

The Postmaster General further states under the sanction of his oath that he is advised and believes that there is an organized propaganda which has inflamed a large body of people to such an extent that it constitutes in effect the advocacy of treason, insurrection, and forcible resistance to the laws of the United States. Upon such information, he states that this has been actually threatened, and that prominent among the publications thus engaged is the Jeffersonian; that the matter it produces to this end, in contemplation of the Espionage Act, is

nonmailable. After due and thorough consideration, deponent so decided, but prior to his ruling that the issue of June 28, 1917, was nonmailable, the paper was submitted to the Attorney General of the United States, and deponent was advised by the Attorney General that the paper was in violation of section 3 of title 1 of the Espionage Act. For the same reason, and because it contained matter of the same nonmailable description, the Postmaster General, after examination, caused the postmaster at Thomson to be advised that the issue of August 16th was also unmailable. Thus it will be seen that the court is advised of the concurrent opinion of two members of the cabinet, the chief of the Post Office Department, and the chief of the law department of the government, in justification of the action of which plaintiff complains.

A supreme measure of legislation, enacted by Congress for the successful prosecution of the great war in which the country is engaged, termed the Espionage Act, in title 1, section 3, declares that:

"Whoever, when the United States is at war, shall willfully make or convey false reports or false statements with intent to interfere with the operation or success of the military or naval forces of the United States, or to promote the success of its enemies; and whoever, when the United States is at war, shall willfully cause or attempt to cause insubordination, disloyalty, mutiny, or refusal of duty, in the military or naval forces of the United States, or shall willfully obstruct the recruiting or enlistment service of the United States, to the injury of the service * * * of the United States, shall be punished by a fine," etc.

In connection with this, section 1 of title 12 of the same act must be considered. This declares that:

"Every letter, * * * newspaper, etc., in violation of any of the provisions of this act is hereby declared to be nonmailable, * * * and shall not be conveyed in the mails or delivered from any post office or by any * * * carrier."

The light afforded by these sections of a valid and vital law shone upon the pages of the Jeffersonian when they were under the scrutiny of the members of the President's cabinet. Congress had declared war. Thousands of the élite of the American army were on the soil of France. At any moment the crash of their rifle fire and the thunders of their artillery in the vindication and defense of human liberty might be heard. American men of war, manned by Americans, were swiftly cleaving the waters forbidden by the enemy to our commerce, questing every billow for his lurking and deadly craft. By the thousands, the gallant youth of every American state were rallying to the flag. By the vast oversubscription of the Liberty bonds our people had proven that in the common cause they will be as lavish of their treasure as of their blood. With the utmost nobility of soul, with the self-sacrificial spirit of woman, in the humane Red Cross and similar organizations, our country's daughters were no whit behind her sons.

At this juncture of the nation's life, the Postmaster General and the Attorney General have discovered in the plaintiff's publication, which the government through its mail was distributing to its people, such passages as this, taken from the issue of June 28th:

"Men conscripted to go to Europe are virtually condemned to death and everybody knows it.

"President Wilson admitted as much in his Flag Day address. * * * Why is your boy condemned to die in Europe?"

Again in the issue of July 19th is a statement aimed at the Chief Magistrate of the United States. That it is false, that it was intended to interfere with the operation or success of our forces, that it was an attempt to cause insubordination, disloyalty, mutiny, or refusal of duty by them, the Postmaster General might well conclude.

"Does he, the President, not know that the Conscription Act, forcing citizens out of the Union to die in Belgium and France, is every bit as lawless as the action of the Phelps Dodge Copper Company in forcing these one thousand one hundred (1,100) miners out of Arizona? What are 1,100 miners to six hundred and eighty-five thousand (685,000) conscripts whom our Cæsar has condemned to death in 'foreign fields of blood'?"

Nor is such reference as the following, to the Commander in Chief of the Army and Navy of the United States, made in time of war, deterrent to insubordination, disloyalty, mutiny, or refusal of duty:

"Are we—like the sow returning to her wallow, and the dog to his vomit—to go back to the medievalism of personal rule—a Pope's word ruling the church,. and a king's word ruling the state?

"Why not call Woodrow Wilson by the name of King, or Kaiser, or Czar, if the Constitution is to be treated as the Kaiser treated the Belgium treaty?

"The Kaiser did not swear to support the Belgium treaty. Woodrow Wilson did swear to support the Constitution.

"And now, within six months after taking that solemn and public oath, the Congressmen and President, who did so, are treating the Constitution exactly as the Kaiser treated the Belgium treaty."

Nor does Congress escape. On page 4 of the issue of July 19th is printed the vote of the House on the question to create a national army; this under the title:

"These are the Representatives in Congress, Lower House, Who Confiscated the Liberty and the Lives of Your Sons."

A more direct, but not more effective, effort to obstruct the recruiting or enlistment service of the United States, appears on page 7 of the issue of July 26, 1917:

"I advise [prints the editor of the Jeffersonian] the conscripts to await the decision of the United States Supreme Court, and not to be clubbed by the fact of conscription into enlistment. Once you volunteer, and sign up, you can be sent anywhere, and the law can't help you."

Equally, but not more, unmailable in contemplation of the act of Congress above quoted is the issue of August 16th. In the affidavit before the court the Postmaster General, as we have seen, after charging the existence of an organized propaganda to discredit and handicap the government in the prosecution of the war, declared that such matter is in violation of section 3 of title 1, and sections 1 and 2 of title 12, of the Espionage Act, and is nonmailable; that for these reasons the publication is not a newspaper or other periodical publication, within the meaning of the laws of the United States governing mailable matter of the second class; and the deponent so decided after

due and thorough consideration of the matters and things stated herein. In this conclusion I find that he was fully justified.

In such crises in Lacedæmon, the Spartan mother, when her son went forth to battle, was accustomed to exclaim, "Return on your shield or with it!" How dissimilar, how sordid, is the cowardice the Jeffersonian would encourage:

"What about a carload of German soap made out of our boys?

"What about manuring German fields with our bravest youth, and fattening German hogs on the choicest selection from American manhood?

" 'I raised my boy to be a soldier,' says the song, but did mother raise him to be pig feed?"

Had the Postmaster General longer permitted the use of the great postal system which he controls for the dissemination of such poison, it would have been to forego the opportunity to serve his country afforded by his lofty station.

This is, moreover, an additional consideration of the weightiest character, which obliges the denial of such an injunction as is here sought. An appeal is made to an American court of equity to oblige the postal authorities of our country to contribute its mailing facilities for the furtherance and success of a propaganda against the nation as distinct as it is truculent and dangerous. Under the familiar rule in equity, such an appeal is addressed largely to the discretion of the court. It is to be determined by the conscience of the chancellor, and always with proper regard to the public welfare. This imports the country's welfare. And a party seeking this extraordinary remedy, under a rule equally familiar, must come into court with clean hands. Can one be said to come with clean hands when the policy, methods, and efforts he would maintain may cause his hands to be imbrued in the blood of the demoralized and defeated armies of his countrymen? If by such propaganda American soldiers may be convinced that they are the victims of lawless and unconstitutional oppression, vain indeed will be the efforts to make their deeds rival the glowing traditions of their hero strain. On the contrary, the world will behold America's degradation and shame, the disintegration under fire of our line of battle, the inglorious flight of our defenders, like the recent debacle of the Russian army, brought about by methods much the same, the ultimate conquest of our country, the destruction of its institutions, and the perishing of popular government on earth.

The preliminary injunction is denied.